UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
STATESBORO DIVISION

| | | |
|---|---|---|
| KAYLYNN NICOLE BUCHEN, as natural Guardian of a minor child, A.B. and ESTATE OF ANDREW BRYCE IRISH, by and through Jennifer Ashdown, its Administrator, | ) ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case Number:  CV 623-075 |
| | ) | |
| WELLPATH, LLC, a Tennessee Corporation, ROLAND BROWN, M.D., individually, LYNN SEAMANS, individually JANET MORRIS, individually, DAWNIELLE TREVINO, individually, SHAWN BLALOCK, individually, ALISON JONES, individually, and NATASHA GRANT, individually. | ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

COMES NOW Plaintiff Kaylynn Nicole Buchen, by and on behalf of her and Andrew Bryce Irish's child A.B., and Plaintiff Jennifer Ashdown, Administrator of Andrew Bryce Irish's estate (hereinafter, "Plaintiffs"), and file this Complaint for Damages, showing the following.

## PARTIES

1.  Kaylynn Nicole Buchen ("Ms. Buchen") is a person of full age of majority and a resident of Georgia.  She is the mother of A.B., who is Andrew Bryce Irish's child.  A.B. is a minor and Ms. Buchen brings this case on A.B.'s behalf as her mother and natural guardian.

2. Jennifer Ashdown is the Administrator of Andrew Bryce Irish's estate by the Probate Court of Bulloch County, Georgia.[1]

3. The estate sues to recover damages for the pain and suffering Andrew Bryce Irish experienced prior to his death.

4. Ms. Buchen sues to recover the full value of the life of Andrew Bryce Irish (hereinafter "Mr. Irish").

5. At the time of his death, Mr. Irish was a pretrial detainee at the Bulloch County Jail (hereinafter "Jail") in Statesboro, Georgia.

6. Mr. Irish was born on December 4, 1996, and was 25 years old at the time of his death. He died on January 15, 2022, while in the custody and care of the Bulloch County Sheriff's Office in its Jail.

7. Wellpath, LLC (hereinafter "Wellpath") is a foreign limited liability company whose principal place of business is 3340 Perimeter Hill Drive, Nashville, TN, 37211.

8. Wellpath can be served by perfecting service upon its registered agent for service, Corporate Creations Network Inc., 2985 Gordy Parkway, 1st Floor, Marietta, GA, 30066. At all times pertinent hereto, Wellpath provided medical care services to people detained in the Jail pursuant to a contract with Bulloch County, Georgia, and the Sheriff of Bulloch County.

9. Roland Brown, M.D. (hereinafter "Brown"), is a physician licensed to practice in the State of Georgia and is sued in his individual capacity. At all times material to this action, Brown was the principal physician overseeing the provision of medical care to people detained in the Jail by and through the contract held by Wellpath. Brown was the clinician provider for Mr. Irish's

---

[1] Plaintiffs filed documents to establish Mr. Irish's estate and are awaiting court appointment of his mother, Jennifer Ashdown.

medical treatment at the Jail from Mr. Irish's admission on December 31, 2021 until his death on January 15, 2022.

10. Lynn Seamans (hereinafter "Seamans") was the Health Services Administrator at the Jail and as such, was the supervisor for the medical care system at the Jail by and through the contract held by Wellpath. Upon information and belief, at all times material to this action, Seamans was employed by Wellpath. Alternatively, she was an employee of either the Bulloch County Sheriff's Office or Bulloch County, Georgia as the Health Services Administrator at the Jail.

11. Janet Morris (hereinafter "Morris") was an LPN at the Jail. Upon information and belief, at all times material to this action, Morris was employed by Wellpath. Alternatively, she was an employee of either the Bulloch County Sheriff's Office or Bulloch County, Georgia as a nurse at the Jail.

12. Dawnielle Trevino (hereinafter "Trevino") was an LPN at the Jail. Upon information and belief, at all times material to this action, Trevino was employed by Wellpath. Alternatively, she was an employee of either the Bulloch County Sheriff's Office or Bulloch County, Georgia as a nurse at the Jail.

13. Shawn Blalock (hereinafter "Blalock") was an LPN at the Jail. Upon information and belief, at all times material to this action, Blalock was employed by Wellpath. Alternatively, he was an employee of either the Bulloch County Sheriff's Office or Bulloch County, Georgia as a nurse at the Jail.

14. Alison Jones (hereinafter "Jones") was an LPN at the Jail. Upon information and belief, at all times material to this action, Jones was employed by Wellpath. Alternatively, she

was an employee of either the Bulloch County Sheriff's Office or Bulloch County, Georgia as a nurse at the Jail.

15.   Natasha Grant (hereinafter "Grant") was a LPN at the Jail.  Upon information and belief, at all times material to this action, Grant was employed by Wellpath.  Alternatively, she was an employee of either the Bulloch County Sheriff's Office or Bulloch County, Georgia as a nurse at the Jail.

16.  All Defendants had responsibility to provide health care to Mr. Irish when they were working at the Jail on the dates of his pretrial detention: December 31, 2021, to January 15, 2022.

17.  All Defendants were responsible for ensuring appropriate medical care to individuals detained in the Jail, including to Mr. Irish.  At all pertinent times, Defendants were acting under color of law.

## JURISDICTION AND VENUE

18.  This Court has jurisdiction of this case pursuant to 28 U.S.C. §1331; 28 U.S.C. §1343; 28 U.S.C. §1367; 42 U.S.C. §1983; and 42 U.S.C. §1988.

19.  Upon service of process, this Court acquires personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(a).

20.  Venue is proper in this Court because the conduct of the Defendants which forms the basis of this Complaint occurred in the Southern District of Georgia.

## FACTUAL ALLEGATIONS

21.  On December 31, 2021, Mr. Irish was booked into the Jail.

22.  Since at least 2017, staff at the Jail had knowledge that Mr. Irish suffered from Type 1 diabetes.

23. At all times material to this action, the individual Defendants were medical staff at the Jail for Bulloch County, Georgia, employed by either Wellpath, the county, or the Bulloch County Sheriff's Office, and acting under the color of law.

24. At all times while a pretrial detainee in the custody and care of the Bulloch County Sheriff's Office, Mr. Irish, pursuant to the Fourteenth Amendment to the United States Constitution, had the right to receive timely and appropriate medical treatment for any injury or illness, including his Type 1 diabetes.

25. At all times that Mr. Irish was in the custody of the Bulloch County Sheriff's Office, Defendants were responsible for ensuring that appropriate and necessary medical care was provided to him.

26. On December 31, 2021, upon being booked into the Jail, Bulloch County Sheriff's Office Deputy Margie Kayleen Blair noted that Mr. Irish stated that "he has Type 1 Diabetes and takes insulin."

27. For a reason not documented in Wellpath or Bulloch County Sheriff's Office records, Mr. Irish was placed on suicide watch and staff were to check on him every 15 minutes.

28. In spite of the prior knowledge of Mr. Irish's chronic health conditions, including the note on the December 31st arrest/booking report that he had Type 1 diabetes, no one in the Jail checked his blood sugar level until January 4, 2022—four days after his admission into the Jail.

29. According to the American Diabetes Association's Position Statement on Diabetes Management in Detention Facilities, attached as Exhibit 2, all diabetes patients treated with insulin should have a blood glucose determination made "within 1–2 hours of arrival" to the facility.

30. On January 4, 2022, at 9:30 a.m., Mr. Irish was seen by health care staff for the first time when Seamans completed a health intake receiving screening.

31. At the intake screening, Seamans documented that Mr. Irish had "Diabetes . . . IDDM" -- insulin dependent diabetes mellitus. She did not note whether Mr. Irish was on any diet and did not note when he ate his last meal. Seamans tested Mr. Irish's blood sugar levels. The result was an alarming 370 mg/dL.

32. In spite of noting no mental health concerns, Seamans placed Mr. Irish back on suicide watch and in addition recommended "Medical Observation Housing."

33. After being placed back onto suicide watch, Mr. Irish was not seen by another nurse for over six hours. At 4:53 p.m. on January 4, Grant tested Mr. Irish's blood sugar levels. The result was another dangerously high reading of 374 mg/dL.

34. According to the University of Michigan,[2] when patients receive two or more blood sugar readings of 300 mg/dL in a row, their doctor should be immediately informed.

35. At the time of Mr. Irish's second dangerously high blood sugar test results, he was detained in the Jail and unable to inform his physician. Nothing in Mr. Irish's medical records indicate that a physician was informed.

36. Grant's response to the dangerously high level of glucose was to note in Mr. Irish's medical records that food was given to him. Grant did not administer or provide insulin to Mr. Irish. On information and belief, none of Defendants and no other Jail staff member provided Mr. Irish with insulin in response to his dangerously high blood sugar level on January 4.

37. Mr. Irish was not seen by a nurse again until the next morning, January 5, at 5:46 a.m. Trevino tested Mr. Irish's blood sugar levels and found a reading of 502 mg/dL. In spite of this being the third consecutive reading above 300 mg/dL, nothing in Mr. Irish's medical records indicate any physician was informed.

---

[2] https://www.everydayhealth.com/type-2-diabetes/high-and-low-blood-sugar/ (last accessed Dec. 21, 2023).

38.   At the time of Mr. Irish's third dangerously high blood sugar test results, he was detained in the Jail and unable to inform his physician.

39.   According to notes in Mr. Irish's records, Trevino provided an injection of insulin to Mr. Irish and noted that she would "recheck BG"—blood glucose—in 30 minutes.  Nowhere in the file is it indicated that Trevino or any other Defendant rechecked Mr. Irish's blood glucose levels until after 5 p.m. on January 5.

40.   At 5:23 p.m. on January 5, Jones tested Mr. Irish's blood sugar levels and found a reading of 403 mg/dL.  Despite this being the fourth consecutive reading above 300 mg/dL, nothing in Mr. Irish's medical records indicate any physician was informed.  According to notes in Mr. Irish's records, Jones provided an injection of insulin to Mr. Irish.

41.   Nowhere in Defendants' MAR—medical administration record—for Mr. Irish is it indicated that Mr. Irish was provided insulin on January 5.

42.   At 4:30 a.m. on January 6, Trevino tested Mr. Irish's blood sugar level and found a reading of 474 mg/dL.  Despite this being the fifth consecutive reading above 300 mg/dL, nothing in Mr. Irish's medical records indicate any physician was informed.

43.   According to notes in Mr. Irish's records, on January 6 Trevino provided an injection of insulin to Mr. Irish, rechecked his blood glucose at 5 a.m., and noted that Mr. Irish's blood sugar level had dropped to 388 mg/dL.  This was the sixth consecutive blood sugar reading above 300 mg/dL.  Nothing in Mr. Irish's medical records indicate that a physician was informed.

44.   At 8 p.m. on January 6, Blalock tested Mr. Irish's blood sugar level and found a reading of 372 mg/dL.  Despite this being the seventh consecutive reading above 300 mg/dL, nothing in Mr. Irish's medical records indicate any physician was informed.

45.  At 5:19 a.m. on January 7, Blalock tested Mr. Irish's blood sugar level and found a reading of 374 mg/dL.  Despite this being the eighth consecutive reading above 300 mg/dL, nothing in Mr. Irish's medical records indicate any physician was informed.

46.  Between 9:45 a.m. on January 7 to 4:07 a.m. on January 8, Defendants tested Mr. Irish's blood sugar levels three times.  For the first time since his admission into the Jail, the readings were below 300 mg/dL.

47.  At 4:54 p.m. on January 8, Morris tested Mr. Irish's blood sugar level and found a reading of 316 mg/dL.  According to the University of Michigan,[3] a reading of 316 mg/dL is dangerously high.

48. At 10:22 p.m. on January 8, Morris tested Mr. Irish's blood sugar level and found a reading of 323 mg/dL, another dangerously high reading.  Given that this was Mr. Irish's second blood sugar reading of over 300 mg/dL in a row, a doctor should have been immediately informed.

49.  On January 8, after his second dangerously high blood sugar reading in a row, Mr. Irish was, of course, detained in the Jail and unable to inform his physician.  Nothing in Mr. Irish's medical records indicate that any Defendant or any other Jail staff member informed any physician.

50.  From January 9 to January 13, Defendants tested Mr. Irish's blood sugar level twelve more times.  Almost 42% of the time and including the last two readings on January 13, the readings were over 300 mg/dL and dangerously high.

51.  On January 12, Defendants took no readings of Mr. Irish's blood sugar levels.

52.  On January 14, Defendants took no readings of Mr. Irish's blood sugar levels.

53.  Other than the information gathered by Bulloch County Sheriff's Office Deputy Margie Kayleen Blair during the December 31, 2021, booking, wherein Mr. Irish stated that "he

---

[3] https://www.everydayhealth.com/type-2-diabetes/high-and-low-blood-sugar/ (last accessed Dec. 21, 2023).

has Type 1 Diabetes and takes insulin" there is no indication that Jail staff other than Defendants did anything related to Mr. Irish's chronic medical condition.

54.    Jail security documents from December 31, 2021, to January 14, 2022[4]—one day before Mr. Irish was found dead in his cell—indicate no training or awareness of the deadly complications Mr. Irish faced from a lack of care and treatment by Defendants of Mr. Irish's Type 1 diabetes.

55.    According to the American Diabetes Association, the Jail "should have written policies and procedures for the management of diabetes and for training of medical and security staff in diabetes care practices."

56.    According to the American Diabetes Association: "Ongoing and reliable diabetes therapy is important in order to reduce the risk of acute complications including life-threatening hyper- and hypoglycemia (high and low blood sugar), as well as later complications, including cardiovascular events, visual loss, renal failure, and amputation."

57.    According to the American Diabetes Association: "Reception screening should emphasize patient safety.  In particular, rapid identification of all insulin treated persons with diabetes is essential in order to identify those at highest risk for hypo- and hyperglycemia and diabetic ketoacidosis (DKA).  All patients treated with insulin or sulfonylureas should have a capillary blood glucose (CBG) determination within 1–2 hours of arrival."

58.    According to the American Diabetes Association: "It is critically important to determine if an individual has type 1 diabetes because the omission of insulin for as little as 24 hours can result in severe metabolic decompensation, including diabetic ketoacidosis. In addition,

---

[4] No records exist of any monitoring of Mr. Irish by non-Defendants Jail staff on the dates of January 11 and 12, 2022.

people with type 1 diabetes are at higher risk for severe hypoglycemia due to the presence of hypoglycemia unawareness and therefore need more frequent glucose monitoring to detect impending severe hypoglycemia."

59.  According to the American Diabetes Association: "Signs and symptoms of hypo- or hyperglycemia can often be confused with intoxication or withdrawal from drugs or alcohol. Individuals with diabetes exhibiting signs and symptoms consistent with hypoglycemia, particularly altered mental status, agitation, combativeness, and diaphoresis (excessive perspiration/sweating), should have CBG levels measured immediately."

60.  During the January 4, 2022, health intake receiving screening completed by Seamans, she noted that Mr. Irish was "combative."  Despite noting this, having knowledge that he suffered from Type 1 diabetes, and uncovering a dangerously high blood sugar reading of 370 mg/dL, Seamans did not administer insulin to Mr. Irish or take any steps to ensure that appropriate treatment would be provided to Mr. Irish for his chronic and potentially deadly health condition.

61.  According to the American Diabetes Association: "It is essential that medication and nutritional goals be continued without interruption upon entry into the detention system, as a hiatus in either medication or appropriate nutrition may lead to either severe hypo- or hyperglycemia that can rapidly progress to irreversible complications, even death."

62.  According to the American Diabetes Association: "Patients with type 1 diabetes are at risk for hypoglycemia and should have their CBG monitored three or more times daily or have access to CGM technology. Glucose should be monitored prior to meals, at bedtime, prior to exercise, when low blood glucose is suspected, and after treating low blood glucose."

63.  Finally, according to the American Diabetes Association: "People with diabetes should receive care that meets national standards. Being incarcerated does not change these standards."

64.  On January 15, 2022, at 12:55 a.m., Mr. Irish was found unresponsive in his cell—N3—on the floor of his cell between the toilet and bed.  Seamans was on the scene and she and non-Defendant Jail staff were unable to revive Mr. Irish.  At approximately 1:18 a.m., a physician at the hospital informed the EMTs who had arrived on the scene to stop life-saving measures.

65.  An autopsy determined that the cause of Mr. Irish's death was ketoacidosis due to diabetes mellitus.

66.  If Mr. Irish had received appropriate medical care for his chronic medical condition—Type 1 diabetes—he would not have died at the Jail on January 15, 2022.

67.  Defendants knew of Mr. Irish's chronic medical condition and failed to provide an appropriate and timely health intake screening.

68.  Defendants knew of Mr. Irish's chronic medical condition and failed to provide regular blood sugar testing.

69.  Defendants knew of Mr. Irish's chronic medical condition and failed to provide appropriate, medically necessary insulin and dietary treatment.

70.  Defendants knew of Mr. Irish's chronic medical condition and failed to properly diagnose his hypoglycemia, and failed to properly treat his hypoglycemia, which led to his death.

71.  Brown, Seamans, Morris, Trevino, Blalock, Jones, and Grant failed to ensure proper medical care for Mr. Irish's chronic medical condition—Type 1 diabetes—causing his death at the Jail on January 15, 2022.

72.  Wellpath is legally responsible under state law for the wrongful acts of its employees or agents Brown, Seamans, Morris, Trevino, Blalock, Jones, and Grant under the doctrine of *respondeat superior* because their acts occurred within the scope of their employment or agency.

73.  At all times relevant to this complaint, Defendants acted under color of law.

74. All Defendants are liable to Plaintiffs for compensatory and punitive damages.

75. All Defendants are liable jointly, severally, and in solido for Plaintiffs' injuries.

76. Defendants' actions were reckless, willful, wanton, and malicious, and constituted deliberate indifference to the rights of Mr. Irish. Defendants' actions were the proximate cause of the injuries and death of Mr. Irish and the damages of Plaintiffs.

77. The failures of all defendants are well known and consistent with actions resulting in deliberate indifference to the serious medical care needs of prisoners at Bulloch County Jail, including, but not limited to, the following examples:

a. John Baillie— who suffers from Crohn's disease— was incarcerated at the Jail in April 2018 when he experienced a severe flare-up, causing painful bowel movements, stomach pain, rectal pain, and weight loss. On June 6, 2018, the Jail sent him to Cedar Surgical Associates in Statesboro, Georgia, where he was examined by a doctor and diagnosed with a fissure and a ruptured polyp. The doctor put Mr. Baillie on antibiotics and referred him to a gastrointestinal specialist to receive a colonoscopy. Over the next several weeks, Mr. Baillie sought to schedule his colonoscopy, and "Head Nurse" Lynn (upon information and belief, Lynn Seamans) said she would look into it. Months later, Mr. Baillie's infection— which had briefly subsided after he took antibiotics—returned, leading him to be seen by another doctor who also stated Mr. Baillie needed a colonoscopy and to be seen by a gastrointestinal specialist. In response, Nurse Lynn told Mr. Baillie that the Jail administrator would never approve any surgical procedure at the Jail, and Mr. Baillie would have to wait until he left the Jail to have a colonoscopy. He continued to suffer from difficult bowel movements and blood in his stool every few months.

b.  James Jackson was denied necessary medical care for his heart disease and high blood pressure by the nurses at the Jail in 2021 and 2022,  despite having high blood pressure, passing out, and experiencing other serious symptoms. Lynn Seamans and Shawn Blalock—also defendants in the instant case—were named in that suit.

c.  After being shot multiple times and brought to the Jail in 2022, Rodricus Scott was denied medical care for hours. Subsequently, an infection from a wound was also left untreated. Lynn Seamans—while not named as a defendant—was alleged to have denied Mr. Scott care in his complaint.

d.  Jacqun Wells was repeatedly denied appropriate medical care while incarcerated at the Jail in 2021. He had broken out in painful rashes and blisters in June 2021 and submitted many sick calls. He went untreated until December 2021 when he was taken to a doctor, who recommended he be transported to a hospital. Instead, he was taken back to the Jail, given antibiotics, and put in a holding cell for 120 days where he was seen three times by medical professionals. At a sentencing hearing for his criminal charges, a judge ordered he be brought to a facility where his medical needs could be treated. He was eventually transported to a hospital where he was diagnosed with sarcoidosis, a painful inflammatory disease in which the immune system overreacts, causing groups of cells to form clusters of inflamed tissue called "granulomas" in one or more organs of the body.

e.  Antonio Saunders was delayed medical care for high blood pressure while incarcerated at the Jail in 2020. A nurse at the facility told Mr. Saunders that they were delayed in responding because they thought the call was for his cellmate, and that his blood pressure hadn't been logged in the book. Mr. Saunders now suffers from migraines and diminished memory.

f.   Antonette Phillips injured his pinky playing basketball at the Jail in 2020. He was forced to wrap his finger himself and didn't see an outside orthopedic doctor for ten days. The outside doctor told Mr. Phillips that, due to the length of time between the dislocation and resetting of his finger, the resulting stretching of the affected ligaments created a strong possibility that it would remain in a 'crooked' position permanently, unless proper physical therapy was provided to him. Mr. Phillips's finger continues to cause him pain and remains crooked and unable to stretch out of its normal position.

g.   Personnel at the Jail refused to provide Shannon Horne with Human Immunodeficiency Virus ("HIV") antiviral medication for approximately 25 days in 2016, which made him very ill.

h.   John Miller scraped his bare shoulder against a holding cell wall in the Jail in 2009. He later awoke with a burning and itching sensation at the location of the injury, but he was not properly treated. What began as a scrape ended—over two months and a 60–pound drop in body weight later—with a staph infection that may have traveled to his leg, leading to a total hip replacement.

i.   Olaudah McKenzie was attacked by four other incarcerated men at the Jail in June 2015. While doctors at a local hospital said he required emergency surgery, he was denied that surgery until October 2015. Mr. McKenzie consequently suffered loss of vision, among other issues.

j.   James McMillan was denied medical attention in relation to a spider bite on four different occasions in the Jail in 2012. Mr. McMillan experienced swelling, discoloration, and extreme pain.

78.  Wellpath's own policies and proposals demonstrate that they know how to appropriately care for those suffering from diabetes and recognize the serious risks of harm associated with deficient care.

a.  In a Wellpath proposal to an Oregon county,[5] they declared that the focus of the Wellpath Special Needs Program, which includes treating patients with diabetes, allows them "to manage our patients' needs before they escalate and require off-site consultation, or result in grievances and litigation." *Id.* at 109.  Wellpath also acknowledged that training topics for jail staff includes diabetes care. *Id.* at 76. The proposal additionally states,

> Wellpath provides a complete chronic disease management program in accordance with NCCHC standards. Our chronic disease management program is designed to reduce the frequency and severity of symptoms, prevent disease progression and complication, and foster improved function. Our multifaceted program includes clinical monographs, disease-specific guidelines, clinical decision support tools, and a clinical informatics platform to guide population-based interventions that are consistent with national clinical practice guidelines for common chronic diseases such as:  Diabetes. . .

*Id.* at 111. There are at least 16 mentions of diabetes and diabetes care in this document alone. According to the attached resume of the Chief Clinical Officer, one of his projects included "developing centers of excellence for **diabetes**, chronic kidney disease, end stage renal disease, and chronic obstructive pulmonary disease." *Id.* at 186.

b.  In a Wellpath proposal submitted to a Colorado county,[6] they boasted that "Wellpath excels in the diagnosis and treatment of patients with diabetes, as evidenced by 63.9% of our

---

[5] Klamath County Sheriff's Office Request for Proposal for Kalmath County Jail Medical Services, Submitted by Wellpath (Jul. 17, 2020),  https://www.klamathcounty.org/AgendaCenter/ViewFile/Item/11895?fileID=8727  (last accessed Dec. 21, 2023).

[6] Larimer County Proposal for Inmate Medical Services, Submitted by Wellpath (Mar. 30, 2022), https://apps.larimer.org/cora/upload/08-12-2022_020801_Kacy_Kincaid7.pdf. (last accessed Dec. 21, 2023).

patients having A1C control as compared to 49.4% of Medicaid patients in the community." *Id.* at 11. The proposal further stated that "Wellpath is constantly developing and piloting technological innovations and new paradigms of care within the Wellpath Healthcare Cloud. . . . New services and treatments in development include diabetes management. . . ." *Id.* at 26.

c.  According to a 2021 remedial plan in Santa Barbara, California, entered into pursuant to a stipulated judgment, Wellpath was responsible for "A Comprehensive Diabetes Management Protocol."[7] This protocol would "ensure regular testing of blood sugar and hemoglobin A1C levels for patients with diabetes, at clinically appropriate intervals" and mandated that patients "have access to the types of insulin and dosing frequency consistent with the treatment they were receiving prior to detention or most appropriate to their individual treatment goals and correctional setting, including multiple daily injection therapy using long-acting and rapid-acting insulins and insulin pump therapy, as clinically appropriate." *Id.* at 19. According to the plan, this was completed as "Wellpath's Continuous Quality Improvements process addresses the provisions of this requirement, as delineated in Wellpath's policies." *Id.* Additionally, the implementation of a Chronic Disease Management Program for the management of chronic conditions, including but not limited to diabetes, was completed and documented in Wellpath policies. *Id.* at 16.

---

[7]  Remedial Plan Status Report from The County of Santa Barbara (Jun. 2, 2021), https://www.disabilityrightsca.org/system/files/file-attachments/Remedial%20Plan%20Status%20Report%2006%2002%202021.pdf. (last accessed Dec. 21, 2023).

d. In August 2022, Wellpath became the first healthcare company awarded full NCQA accreditation for correctional healthcare programs.[8] Wellpath received full NCQA Population Health Program Accreditation for their diabetes program. *Id.*

79. Despite the institutional knowledge of proper diabetic care, Wellpath has a well-documented history of acting with deliberate indifference to the serious medical care needs of their patients suffering from diabetes, including, but not limited to, the following examples:

a. In late 2018 and early 2019, a Wellpath physician, Dr. Kim, conducted medical examinations of Gregory Young and became aware that Mr. Young suffered from Type 2 diabetes. Dr. Kim prescribed an oral dose of Glipizide as a treatment for diabetes. However, Mr. Young had informed Dr. Kim that he had been diagnosed as a non-insulin user and asked Dr. Kim to consult with his primary health care physician. Dr. Kim failed to do so. Dr. Kim disregarded this medical information and prescribed a dose of insulin to Mr. Young on January 16, 2019, which was life-threatening and caused him severe medical trauma and hospitalization.

b. Wellpath staff removed Larry Lemay's insulin pump in 2019 and ignored his subsequent complaints regarding signs of high blood sugar and adverse medical symptoms including weakness, dizziness, excessive thirst, excessive urination, pain, rapid heartbeat and rapid breathing. Mr. Lemay was eventually seen by medical staff, where it was discovered that his blood sugar was over 540 mg and contained large amounts of ketones. He was admitted to the hospital for Diabetic Ketoacidosis, a life-threatening condition due to lack of insulin.

---

[8] Wellpath Announcement of NCQA Accreditation, Wellpath website (Aug. 9, 2022), https://wellpathcare.com/2022/08/09/wellpath-becomes-the-first-healthcare-company-awarded-full-ncqa-accreditation-for-correctional-healthcare-programs/ (last accessed Dec. 21, 2023).

c. Between December 27, 2017 and March 30, 2018, Steven Hardy filed no less than twelve grievances seeking medical care for his worsening condition while under Wellpath's care, all of which were rejected on varying grounds. He arrived at Camp Hill in July 2017 in urgent need of medical care: part of his leg had previously been amputated due to diabetes and had developed an infected open wound as a result of an ill-fitting prosthesis. Mr. Hardy repeatedly grieved Wellpath's failure to properly treat his leg wound—including declining to follow a doctor's recommendation to transfer him to an offsite medical facility for treatment—and begged for help as his wound continued to deteriorate. He also experienced severe mental distress worrying about losing his leg but was also denied mental health treatment. A few months after the last grievance rejection, Mr. Hardy's fears came to pass when it became necessary to amputate more of his leg.

d. A Wellpath nurse repeatedly failed to change needles between vials when injecting patients with partial insulin doses in 2021. The nurse injected an HIV-positive patient with a partial dose from one insulin vial and then used the same needle to draw the other part of the dose from a new vial before injecting the patient a second time, thereby contaminating the second insulin vial with the HIV-positive patients' blood. The same vial was later used to treat other incarcerated patients with diabetes. Wellpath's health services administrator at the jail told medical personnel not to discuss the potential insulin contamination incident.

e. A Wellpath nurse gave Frederick Brown the wrong medication in 2021, causing his health to deteriorate and his blood pressure to rise to dangerous levels. Additionally, Wellpath medical personnel declined or failed to provide certain soft shoes that Mr. Brown was prescribed for his diabetes, causing him pain and difficulty walking.

f. Wellpath denied Kenneth Shearer proper medical care for his diabetes in 2018. He experienced excessive foot swelling as a result of his diabetes but was denied appropriate footwear and medical treatment. As a result, he experienced painful ulcers and subsequently required amputation of some of his toes.

g. In 2020, Wellpath discontinued Steven Pinder's diabetic medication, Trental, which caused Mr. Pinder pain in his legs and feet from diabetic nerve damages.

h. Multiple Wellpath nurses regularly and continuously denied Jeffery Johnson his diabetic medication in January 2022. When he begged for his medication, one Wellpath nurse stated, "why don't you file something against me like you did Barbra Short [Hanley]" and another said, "think about the pain next time you file a lawsuit against me." In October 2022, Mr. Johnson was extremely hypoglycemic with symptoms, begged for sick calls for 3 days and was refused, and was never given a blood glucose check. When he brought suit in federal court, the Court found that Mr. Johnson sufficiently alleged a policy, custom, or practice on the part of Wellpath and denied their Motion to Dismiss.[9]

80. The United States Department of Justice investigated Wellpath's atrocious treatment of those with chronic conditions, such as diabetes, in the San Luis Obispo County Jail.[10] It found that prisoners were subject to a to substantial risk of serious harm due to Wellpath's failure to provide adequate medical care. *Id.* Significant delays in care, as well as deficiencies in the care provided, harmed prisoners and placed others at substantial risk of harm. *Id.*

---

[9] *Johnson v. Wellpath/CSS*, No. 3:21-CV-00484-JHM, 2023 WL 4240756, at *3 (W.D. Ky. June 28, 2023).

[10] Letter from the United States Department of Justice to San Luis Obisbo County Officials (Aug. 31, 2021), https://www.justice.gov/media/1164191/dl?inline (last accessed Dec. 21, 2023).

**COUNT 1 – Deliberate Indifference Under 42 U.S.C. §1983**
**Against Nurses Seamans, Morris, Trevino, Blalock, Jones, and Grant**

81. Plaintiffs repeat and re-allege each and every allegation of the Complaint.

82. These Defendants owed a duty to provide humane and reasonable medical care to Mr. Irish.

83. These Defendants breached their duties associated with the provision of medical evaluation, medical treatment, and nursing care to Mr. Irish.

84. These Defendants knew of and disregarded an apparent and known risk of serious medical harm to Mr. Irish's health, were deliberately indifferent to Mr. Irish's immediate need for medical attention, and thus are liable under federal constitutional law for this deliberate indifference.

85. The conduct of these Defendants exhibits a total disregard to Mr. Irish's constitutional right to be free from punishment without due process of law and deliberate indifference to his need for medical care, founded upon the Fourteenth Amendment to the United States Constitution, and resulted in significant pain and suffering and the eventual death of Mr. Irish.

86. As a direct and proximate result of the conduct of these Defendants, Mr. Irish was wrongfully deprived of his life and endured great pain and suffering before his death.

87. As a direct and proximate result of the conduct of these Defendants, Ms. Buchen and her and Mr. Irish's daughter A.B. were wrongfully deprived of the full value of the full value of the life of Mr. Irish's life.

**COUNT 2 – Medical Negligence Against Nurses**
**Seamans, Morris, Trevino, Blalock, Jones, and Grant**

88. Plaintiffs repeat and re-allege each and every allegation of the Complaint.

89. These Defendants owed Mr. Irish the standard of medical care required of nurse providers.

90. These Defendants breached the duty of care owed to Mr. Irish.

91. The care provided by these Defendants amounted to no treatment at all, in light of the failures listed herein.

92. Particularly, amongst other failures, these Defendants failed to meet the standard of care, in that:

   a. These Defendants failed to conduct an initial health screening and check his blood sugar levels upon Mr. Irish's booking into the Jail on December 31, 2022, even though he informed Jail staff he suffered from Type 1 diabetes.

   b. These Defendants failed to provide adequate medical care to Mr. Irish even though the results of multiple blood sugar tests were dangerously high.

   c. These Defendants failed to provide any medical care for Mr. Irish's Type 1 diabetes on the last days of his life—January 14 and 15, 2022.

93. These Defendants owed a duty to report to a physician the fact that multiple blood sugar tests of Mr. Irish were dangerously high.

94. These Defendants provided markedly substandard nursing care for Mr. Irish's medical needs.

95. As a direct and proximate result of these Defendants' negligence, Mr. Irish was wrongfully deprived of his life and endured great pain and suffering before his death.

96. As a direct and proximate result of these Defendants' negligence, Ms. Buchen and her and Mr. Irish's daughter A.B. were wrongfully deprived of the full value of the full value of the life of Mr. Irish's life.

## COUNT 3 – Deliberate Indifference Under 42 U.S.C. §1983
## <u>Against Doctor Brown</u>

97. Plaintiffs repeat and re-allege each and every allegation of the Complaint.

98. This Defendant owed a duty to provide humane and reasonable medical care to Mr. Irish.

99. This Defendant breached their duties associated with the provision of medical evaluation, medical treatment, and medical care to Mr. Irish.

100. This Defendant knew of and disregarded an apparent and known risk of serious medical harm to Mr. Irish's health, was deliberately indifferent to Mr. Irish's immediate need for medical attention, and thus is liable under federal constitutional law for this deliberate indifference.

101. The conduct of this Defendant exhibits a total disregard to Mr. Irish's constitutional right to be free from punishment without due process of law and deliberate indifference to his need for medical care, founded upon the Fourteenth Amendment to the United States Constitution, and resulted in significant pain and suffering and the eventual death of Mr. Irish.

102. As a direct and proximate result of the conduct of this Defendant, Mr. Irish was wrongfully deprived of his life and endured great pain and suffering before his death.

103. As a direct and proximate result of the conduct of this Defendant, Ms. Buchen and her and Mr. Irish's daughter A.B. were wrongfully deprived of the full value of the full value of the life of Mr. Irish's life.

## COUNT 4 – <u>Medical Negligence Against Doctor Brown</u>

104. Plaintiffs repeat and re-allege each and every allegation of the Complaint.

105. This Defendant owed Mr. Irish the standard of medical care required of medical doctors.

106. This Defendant breached the duty of care owed to Mr. Irish.

107.  The care provided by this Defendant amounted to no treatment at all, in light of the failures listed above.

108.  Particularly, amongst other failures, this Defendant failed to meet the standard of care, in that:

> a.  This Defendant failed to ensure that an initial health screening wherein his blood sugar levels were checked upon Mr. Irish's booking into the Jail on December 31, 2022, even though Jail staff were informed of Mr. Irish's Type 1 diabetes diagnosis.
>
> b.  At least as early on as January 4, 2022, wherein this Defendant signed on as the treating clinician on Mr. Irish's case, he failed to provide adequate medical care to Mr. Irish even though the results of multiple blood sugar tests were dangerously high.
>
> c.  This Defendant failed to ensure nurses under his medical authority monitored Mr. Irish's blood sugar levels on the last days of his life—January 14 and 15, 2022.

109.  This Defendant owed a duty to monitor Mr. Irish's treatment, regardless of whether the nurses under him reported the fact that multiple blood sugar tests of Mr. Irish were dangerously high.

110.  This Defendant provided markedly substandard medical care for Mr. Irish's medical needs.

111.   As a direct and proximate result of this Defendants' negligence, Mr. Irish was wrongfully deprived of his life and endured great pain and suffering before his death.

112.  As a direct and proximate result of this Defendant's negligence, Ms. Buchen and her and Mr. Irish's daughter A.B. were wrongfully deprived of the full value of the full value of the life of Mr. Irish's life.

**COUNT 5 – _Respondeat Superior_ Liability of Wellpath, LLC**

113.  Plaintiffs repeat and re-allege each and every allegation of the Complaint.

114.  As described above, Brown, Seamans, Morris, Trevino, Blalock, Jones, and Grant were employees, agents, and/or officers of Defendant Wellpath, LLC.

115.  Wellpath, LLC is liable to Plaintiffs, under state law, for the negligent actions and inactions of Brown, Seamans, Morris, Trevino, Blalock, Jones, and Grant as set forth in detail above.

**COUNT 6 – _Monell_ Violation Based on Establishment of Policies, Patterns or
Practices to which People in the Jail with Serious Medical Conditions are
Denied Access to Appropriate Medical Care Against Wellpath**

116. Plaintiffs repeat and re-allege each and every allegation of the Complaint.

117.  Wellpath, acting under color of law, violated Mr. Irish's right to be free from punishment without due process as protected by the Fourteenth Amendment to the United States Constitution and 42 USC § 1983. They did so by establishing and maintaining policies, patterns, or practices that provide inadequate and insufficient services for medical and mental health care that they knew would result in the deprivation of such services for people in the Jail with serious medical conditions, including diabetes. Plaintiffs were harmed by the unconstitutionally inadequate and insufficient services for medical care because they resulted in the death of Mr. Irish, who was deprived of appropriate medical treatment from the time he was booked into the Jail on December 31, 2021, until he died in the Jail on January 15, 2022.

118. Plaintiffs were individually harmed by these policies, patterns, or practices because they resulted in the pain, suffering, and death of Mr. Irish, who was deprived of appropriate medical treatment after he was booked into the Jail, and did not receive adequate treatment for his diabetes, resulting in his death fifteen (15) days later.

119. At all pertinent times, Wellpath acted unreasonably, recklessly, and with deliberate indifference and disregard for the safety, constitutional, and civil rights of Mr. Irish by establishing the above-described policies, patterns, or practices.

120. Wellpath is therefore liable to Plaintiffs for the violation of constitutional rights described above pursuant to *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978).

## COUNT 7 – <u>Punitive Damages against All Defendants</u>

121. Plaintiffs repeat and re-allege each and every allegation of the Complaint.

122. The Defendants' acts, as set forth above, were willful, wanton, malicious and so extreme and oppressive as to entitle Plaintiffs to an award of punitive damages from all Defendants.

## COUNT 8 — <u>Wrongful Death against All Defendants</u>

123. Plaintiffs repeat and re-alleges each and every allegation of the Complaint.

124. As is more fully described above, Mr. Irish's death was preventable, yet each of the Defendants herein failed or refused to fulfill their obligation to provide him with medical care.

125. Mr. Irish died as a result of the criminal, intentional, and negligent acts of each of the Defendants.

126. As a direct and proximate result of the Defendants' wrongful acts, Mr. Irish died by homicide.

127. Mr. Irish's death was a wrongful death within the meaning of the Georgia Wrongful Death Act, Ga. Code Ann. § 51-4-1, *et seq*. Section 51-4-2 provides a right of action for the wrongful death of a parent killed by homicide.

128. Under Ga. Code Ann. § 51-4-2(a), Plaintiff A.B. is entitled to bring this action as the surviving child of Mr. Irish. Kaylynn Nicole Buchen is the mother and natural guardian of A.B., and, as such, she brings this action on her behalf.

## DEMAND FOR JURY TRIAL

129.  Plaintiffs repeat and re-alleges each and every allegation of the Complaint.

130.  Plaintiffs hereby demand a trial by jury of twelve (12) persons on all issues herein so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that after due proceedings there be judgment rendered herein in Plaintiffs' favor and against all Defendants individually and jointly, as follows:

1.      A trial by jury on all issues so triable;

2.      Compensatory and punitive damages as prayed for herein;

3.      Reasonable attorneys' fees, as provided in 42 U.S.C. § 1988, 42 U.S.C. § 12205, and 29 U.S.C. § 794(b) and all costs of these proceedings and legal interest;

4.      Punitive damages pursuant to 42 U.S.C. § 1983 and any other applicable statute;

5.      Damages for the full value of the life of Andrew Bryce Irish; and

6.      All other relief as appears just and proper to this Honorable Court.

Respectfully submitted, this 21st day of December, 2023.

THE CLAIBORNE FIRM, P.C.

WILLIAM R. CLAIBORNE
Georgia Bar Number: 126363
DAVID J. UTTER
Georgia Bar Number: 723144
410 East Bay Street
Savannah, Georgia 31401
(912) 236-9559 Telephone
(912) 236-1884 Facsimile
will@claibornefirm.com
david@claibornefirm.com


*/s/ Christopher J. Murell*
Christopher J. Murell
Georgia Bar Number: 195116

Meghan Matt\*
Louisiana Bar Number: 39975
MURELL LAW FIRM
2831 St. Claude Avenue
New Orleans, Louisiana 70117
(504) 717-1297 Telephone
(504) 233-6691 Facsimile
chris@murell.law
meghan@murell.law
\* Motion for admission *pro hac vice*
forthcoming
**ATTORNEYS FOR PLAINTIFFS**